Good morning, Your Honors. May it please the Court, my name is Scott Keene, and I'm appearing on behalf of all of the appellants on both of the consolidated appeals. Good morning. And I would like to reserve five minutes of my time. Manage your time. Thank you, Your Honors. I'm going to begin with the Thie Award. And I think that when you distill the problem to its essence, the problem is that the trial court, although it recognized the structural framework of an analysis that it was supposed to conduct, it never conducted that analysis. And that began in the findings of fact and conclusions of law. Where you have in a single sentence, where you find it in the record at page 32, the court just says, without any analysis whatsoever, that Hubbard was the prevailing party. And it says that despite the fact that throughout the litigation, Mr. Hubbard contended that he was entitled to all of the compensation provided by the consulting agreement throughout its remaining term, which was another 30 months, and a total of $250,000. Well, okay. The attorney's fees clause is on the consulting agreement, right? And there's also analysis under 1717. But if you look at, you contend that he's not the prevailing party because he only got, what, $42,000 out of the $250,000 that he was asking for, correct? That is only partially correct, Your Honor. But it just, you never, you know, you fought the consulting agreement the whole way. And so after, in that time period, the $42,000, I guess the court gave him five months at the $8,000, right? I'm just sort of rounding off figures. And so originally it had been $3,000-something. Then he claims it went up to $8,000. But even during, and then you claim that there was no amendment. Your side did not pay him one cent during the five months, whether it was the three, whether it was the eight. And during trial contended, first off, you owed him zero. But then if you didn't owe him zero, there was no amendment to the eight. And then the court also said, well, I'm not giving you $250,000 because you got a job at Sizzler where you made more money. So what about that? It seems like you won on everything. It doesn't seem like you won on anything there. So what did you win on that? We won on the last of the arguments that the court recognized. We presented multiple theories. There's nothing wrong with presenting multiple theories. Okay. But what did you win on? What was- We won on the termination issue. We won on the issue that he was not entitled to any compensation under the consulting agreement after he effectively terminated. Now the only difference- I thought the reason for the, he got less was because he had gotten another job and therefore it cut off, I guess, what is it, 83% of the damages that he would otherwise have arguably been entitled to. So he- Termination? I mean the- The judge found that he had mitigated damages and he could not have possibly drawn one, not that it was legally impossible, but I guess as a practical matter, he couldn't have done the job that he had gotten, which mitigated his damages and continued in consulting. In the meantime, he did get, what is it, $42,000? 41. 41, right. We don't have to argue over the change. It doesn't matter. There's a California case, isn't there, that suggested that a 16% recovery ratio is not outside a trial court's discretionary zone. It's basically suggesting that a low recovery of approximately 20% creates a question well within the trial judge's discretion. Let me, let me address that. First of all, that's not, there is no bright line standard. In fact, the Dela Cruz Cresta case, which the district court relied heavily on, makes a point of that. There is no one side fits all. There's a two-step analysis under the Sioux standard from the Supreme Court. If you get total victory, then you have an entitlement. If you have something less than total victory, then this discretionary key comes in, and that's what the Dela Cruz case was all about. How do you- And he was awarded $50,000, and therefore we're the prevailing party. Isn't that your logic? No, that is not the logic. Or, and you'd say that he is not the prevailing party because he asked for $100,000 and only got $50,000. Is that the flip side? Not really. So who's the prevailing party under my scenario? I'm sorry, say again? Who's the prevailing party under my hypothetical? Well, as the district court itself recognized, you can't figure it out from the numbers themselves. What you do under both the Sioux case and the Dela Cruz case is you have to analyze the litigation objectives of the parties, the extent to which they achieved them, the extent to which they were defeated, and you look at all of the pleadings, all of the arguments. Now let's focus on that. I agree that that's what it said, but suppose he had just sued for the $41,000 and change and gotten it over your claim that he was entitled to nothing. That's a total victory under Sioux. That's a total victory, but because he asked for more and there was a trial, and your claim is that he was entitled to nothing, so he defeated your argument that he was entitled to nothing, but he got less damages because he had mitigated. Your argument doesn't seem to make much sense to me that if he had just sued for the $41,000, he would have been the prevailing party and had overcome your defense that he was not entitled to anything. You need to go down the next layer of analysis is what you need to do, and you look at the contentions of the parties, as I said. Look at what the court itself recognized were the contentions of Mr. Hubbard as to why he uniformly said he was entitled to $250,000. There were two basic theories. One was essentially an acceleration theory that he was entitled to 100% of whatever the contract provided as soon as they stopped performing. He lost on that, and the reason he lost on that is because there's nothing in the documents or the record that even remotely suggests an entitlement to acceleration. The second argument that he made was, well, it's not exclusive. I could have worked somewhere else. Well, the court agreed with that but found that really that's irrelevant because we're not arguing theories. This wasn't a declaratory relief case. It wasn't a case for an advisory opinion. What really happened was on March 31st, he made it impossible for himself to perform by accepting employment at Sizzler's that made it practically impossible. But the thing is, if you're not getting paid anything, it's kind of impossible to live if you don't get another job. And I realize that this claim is tied to the $42,000, but if you really, what you're saying, you want us to look more, you want us to take the deeper dive, really your side didn't win anything because they said that they valued, which isn't here, they valued his amount that you didn't want to pay him, and then he got the $81,000 on the taxes, right, which is not really part of this, but your side fought everything tooth and nail and didn't really win on any of those issues. Let me correct you on that. Okay. I would like to be corrected. That is not accurate. Okay. We did win. Not only did we win, but we won 105% of our final argument, which was at most he could only collect under the agreement until April 9th, which is the day he filed the lawsuit to dissolve the corporation. That was at most, but your claim, of course, that was an alternative argument that he was entitled to nothing. Here's why this is important, Your Honor. The analysis says that you look at who got the greater relief on the contract claim. Relief is the word that's consistently used in the case law. It's used in the statute as relief. Well, what relief did Mr. Hubbard get? Well, he got $41,000 or 17% of what he claimed. That was affirmative relief. And he won on the breach of contract. The court found that you breached the contract. There was a breach, and the question is damages. It came to damages, and that was a litigation objective. His litigation objective, you cannot read this record and fail to recognize that his litigation objective was to collect $250,000, a major payday, and he got a fraction of that. Our defense was to minimize what he got. In other words, to cut off that entitlement to the best we could. We lost on two theories, but we won on the theory that it was effectively terminated by the terminating. That was by his mitigation. That's something that he did. You could argue you should send him a thank-you note for mitigating the damages, because otherwise the court would have given him the $250,000 if he had just not gotten another job. And as the district court pointed out, he had a duty to mitigate. Right, which you would have argued. If he hadn't taken a job, you would have said, look, he didn't mitigate his damages. If he had taken no job. Yeah. But let me pose to you something different that I think is being overlooked. In order for him to mitigate, it was not necessary for him to take a job that made it impossible to perform under the agreement with Philz. He could have taken a job locally in San Diego that would have given him the time. What did the district court say in his mind? You sound like a Social Security judge. Pardon? You sound like a Social Security judge and a disability judge. I never appeared before one. Having said, well, the guy was a physicist, but now he can go and sell tickets in a movie theater. Well, let me ask you a broader question. I mean, I take your points that you prevailed on some of your theories. As an appellate court, we look, and if we're examining what the district court did in exercise of discretion, we have to cut the district court a fair amount of slack. We're not seeing this in the first instance. The district court has lived with this case. What was really so wrong that we could say, you know, this is so wrong, we have to reverse it on this record? All right. I'm going to get right to it. What is really so wrong is that the district court paid lip service to the type of analysis that needs to be made but never conducted it. Look at the findings. It talks about, oh, yes, we can't just count numbers. I agree. That's what the case law says. You can't just tally up numbers. Then it goes in the next phrase and says, we have to see who obtained the greater relief in light of equitable considerations. That's what it says. That's what the law is. So what were the equitable considerations that the court considered? How did it? It knows the framework for the analysis, but it never made the analysis. The Dillacrista case is an excellent example of what the law expects you to do if you're going to go beyond the numbers and look at something equitable. It is not just a universal license to do what you think is good. There is still the requirement to apply equitable principles within recognized legal standards. And here, the Dillacrista case is very interesting because, let me just summarize the facts because they're important. Landlord sues for $103,000 of back rent and for possession of the commercial premises. Defendant counters, you defrauded me by not telling me about the sewage and leakage. Verdict comes back, the landlord is awarded only $70,000. Why? Because there was some damage. The trial court rejected the fraud theory in its entirety. But in doing the equitable analysis, that calculus, one of the very important things that the court considered was the fact that the day before the matter was set for trial, the defendant abandoned the premises, thereby mooting the possession issue. And when you look at the objectives of the litigation, it said equitably we have to consider that the entitlement to possession was a major litigation objective that was achieved because of the pendency of the litigation, not necessarily the judgment. So look at this case. There was no secondary objective. There was no declaratory relief request. There was no injunctive relief request. This was just about money. The litigation objective was money. And you didn't want to pay it and he wanted it and he got $41,000. I mean it strikes me from this whole case that it may be unfair what I'm about to say to your clients that your clients screwed the plaintiff and want to leave him without a nickel. No. My clients paid, for example, paid $397,000 for his stock. Did he pay that before a lawsuit? Pardon? Did he pay it before a lawsuit? No, it was an exercise of the Section 2000 valuation and purchase entitlements. But he had to file a lawsuit to do that, right? No, he did not. What he did is he filed a lawsuit to destroy the corporation to make it fair. And that's what prompted your clients to pay him the $397,000 under an option that they had. It was not an option, Your Honor. It was not an option at all. I thought the contract or the agreement didn't give them the right to buy out his interest? No. So they just entered into a private contract? No, it's a statutory entitlement. It's a statutory entitlement to avoid dissolution. You can value the dissenter's claims. And that's what they exercised to save the corporation. And if you talk about litigation objectives in total, that was a major litigation objective that they achieved. I want to focus one more time. Okay, your time has expired, but we'll give you some time for rebuttal. I will have to address the corporate issue on rebuttal later. Thank you. Thank you, Your Honor. We'll deem it argued so that you haven't waived your right to discuss it and they can respond to it. Thank you. May it please the Court. Daniel Benjamin on behalf of the plaintiff, Thomas Hubbard. As the Court knows, there's the two different issues. Let me start off with the prevailing party issue. Well, it's kind of shocking that the Court awarded $205,000 in attorney's fees for a contract claim that was recovered only $42,000. That's making what I think would be his best argument. It would have been his best argument if he had wanted to challenge the amount of fees on appeal. They did not challenge the amount of fees on appeal. We know it's substantial. However, the trial court was in the position to judge the record. And this was, as the panel just stated, this was tooth and nail litigation by Phil's Barbecue. They did not want to pay a penny. And we listed the 11 different issues that they raised just to avoid paying a single penny to my client on the consulting agreement alone. That there was no modification. The modification had to be in writing. The statute of frauds. No consideration. Claim preclusion. Anticipatory breach. There were no damages. The list goes on. They fought every issue. And this was actually a bench trial. So not just was the district court judge presiding over the proceedings before that, seeing the nature of summary judgment, the nature of motions to dismiss and everything else. But then he presided over the bench trial and saw all of these arguments being deployed by the defense. So the particular amount, as the judge stated, it was high for the claim. And we don't dispute that. But it was necessitated by the fact that we had defendants who were determined not to pay a single cent to my client. Under California law, could an argument be made that to the extent that you were not successful, the amount of fees can be reduced? I mean, in other words, you spent, let's just say it was $205,000 to litigate the whole thing, including your claim for the total amount on just the few months that were ultimately awarded. Was there an argument to be made under California law that you can reduce the amount of the counsel fees by the extent to which the person was not successful on the claims that he wasn't successful? There can, I believe, Your Honor, be lodestar arguments again that's waived on appeal by the- No, no, I'm just curious. Could an argument have been made under California law? As I understand it, you can make a lodestar argument based on the degree of success. I would say, though, Your Honor, that in this particular case, the only issue on which Mr. Hubbard didn't prevail, mitigation, took up a few minutes of the time. The vast majority of the time was getting through these 11 different defenses that were being presented to avoid paying a single penny to my client. So I think that there was a good reason why the district court, having presided over this, and we put in detailed declarations on our fees, and of course we explained to the court. We actually did not seek all of our fees. We removed some fees that were attributable to other claims and the like. We went through it in detail in our declarations to establish why these particular fees- Did the defendants argue that it should be reduced, make this argument that the $205,000 was too high? Or is it all or nothing again? They attempted to make that argument below the district court found against them in the order, which is at ER 12 through 22, the order on attorney's fees, and they did not appeal that portion of the district court's decision. What this case was, Your Honor, is a case that falls within the abuse of discretion standard. As counsel stated, there's no bright line in these mixed verdict cases. And that's what the suit case states on page 876. It's what the Berkla case that they cite states on page 920, that when you have these mixed decisions, we didn't get 100%, they didn't get the 0% they wanted. Then you have an abuse of discretion. And I don't think, Your Honor, that there have been put forth any facts showing an abuse of discretion here, where district court had presided over the bench trial, had seen the summary judgment proceedings. We had had to defeat so many issues. And the way of thinking about this, and I want to point the court towards the Scott case, Scott v. Blunt, that we had cited out of the California Supreme Court. There's a solution for defendants in this situation. In federal court, they can make a Rule 68 offer of, say, $40,000 or $45,000. In state court, it's a CCP 998 offer, same idea. But if they want to switch the attorney fee risk, if they want to say, look, we don't think we owe you anything, but we'll offer the $45,000 just in case you might prevail, they could have made that. And if they had made that offer, it would have switched how attorney's fees work after the date of that offer. But they didn't make that offer. They never committed to this supposed fallback position, a position they never really argued for until after they had already lost and everything. But that's the solution for defendants, is that you make either a Rule 68 or a 998 offer, and you say, you know, we'll offer you $45,000, and now you plaintiff are taking the risk that if you don't recover at least that much, you're going to be on the hook for fees after the date of the offer. They didn't do it. If the court doesn't have any other questions on attorney's fees, let me address the dividend issue or the taxes issue. I've got a question on the California Corporations Code has a specific provision allowing shareholder agreements in closed corporations to limit the discretion of the Board of Directors. Doesn't this suggest that such an express allowance is required for shareholder agreements in other types of corporations to do so? I don't think, actually, Your Honor, that that negative implication is necessarily suggested. I mean, what we'd be suggesting is that by passing a law saying that closed corporations can have these agreements, somehow we're going to then take that as the legislature also passing a law saying that other corporations cannot have such agreements. I think if the legislature had wanted to pass such a law, which would have changed existing California law, we had cited longstanding California Supreme Court cases, they could have. Closed corporations, as they've developed as a concept, have been regulated by statute, but so have normal corporations for well over a century in California, and the legislature has never seen fit to pass such a law. But you argue in the alternative that Hubbard's entitled to payment for the taxes he paid under a quantum merit theory, but because the taxes on an S-Core pass through the shareholders, Hubbard had to pay the taxes, regardless of whether there was any provision requiring the corporation to pay dividends to its shareholders. So what's the benefit? So what benefit has he given to Phil's Bar-B-Q? Okay. So between 2009, when he filed for the dissolution that then triggered the buyout, and 2012, when the buyout actually was carried out, he continues to pay those taxes. Now he's paying those taxes because Phil's is being permitted to say it's an S-Corp. Because if Phil's can't say it's an S-Corp, of course, it would have to pay the taxes directly. Because Phil's is still an S-Corp, instead Hubbard is paying his percentage share of the taxes, which is a benefit right there to the corporation, but as it turns out, of course, there was a buyout in 2012 that's retroactive to 2009. So now Hubbard has spent three years paying taxes that he receives no benefit from. He got no benefit from the company, by chance, actually did very well during that time. He got no benefit from that at all, but he's paid taxes on those profits. So that's the benefit that was conveyed to Phil's, and that's the benefit that is equitably resolved. Yes, that's the amount of taxes that Mr. Hubbard paid, and that was not disputed by the defendants, as the trial court noted. So that is why, although I think it's clear under the cases that we've cited, and the lack of a statutory prohibition on such a contract, that there is a binding contract here, a binding shareholder agreement. Even if not, unquestionably, there has been a benefit conveyed that would justify the quantum merit in any case. Refresh me. Was there evidence in the record about the 2012 valuation? Or the value of the company as of 2012? There was not, because what happens under the section 2000 buyout is that the appraisers are instructed to value the company as of 2009. There was a bit of evidence that came in at some point about that there had been future, because there was future expansion, but the trial court, and this is in the first phase, ruled that the appraisers needed to focus on what was the situation as of April 2009 when Mr. Hubbard triggered the buyout provision. So when you say there's a benefit because they used the 2009 evaluation, we really don't know what the difference is between the valuation between 2009 and 2012 on this record. What we do know, though, Your Honor, and is in the record and is the point, is that there was profits. Right. Because there was profits to pay tax on. So whatever those profits were due to, even if the company had performed the same and so on, Mr. Hubbard was never going to pay taxes except on profits. If there had been no profits in the company, obviously, he would not have been paying taxes. So we do know what the benefit was to the company in the sense of this is how much taxes they had to pay each year, and this is the amount of taxes that Mr. Hubbard then had to cover. So we do have that in the record, and so we do know what the benefit was for the quantum merit. Sorry if I overspoke a bit in referring to that. No, no, I'm just trying to get to the bottom of it. Increase in value. Yeah, yeah. But the relevant facts for an equitable remedy here are present in the record. I guess the last point, and this goes to the equitable nature of it, is simply that if we were to reach an opposite conclusion here, we're going to have a really unjust situation in a lot of these buyout cases because the buyout, in our case, it took three years. Sometimes maybe it only takes a year. But the buyout is always necessarily after. And the structure of having shareholders, whether it's an S Corp or other LLCs or other structures we have where shareholders pay the taxes of the corporation, it's quite common. And so there's going to be a problem with these buyout situations unless we will equitably credit people for the fact that they still have to pay those taxes. The IRS looks at the date that the shares are transferred. They're ignoring the fact that the buyout was done in an earlier year in terms of value. So I just think, Your Honor, as a basic principle of equity, as well as the fact that it was contracted to, the outcome here by the district court made eminent sense. It was very reasonable. Does the court have any further questions? What about the argument that 13.6 violates public policy? Well, Your Honor, first, it doesn't, because there is no such prohibition on these shareholder contracts as a provision about close corporations and shareholder contracts. But there's no express prohibition. Second of all, the usual public policy concern with dividends is you don't want companies issuing dividends if they're insolvent. But the nature of this particular provision is that you're only issuing dividends in situations where there's a profit and, therefore, taxes are being paid. So there's no concern about insolvency. And that's something that's talked about a bit in the cases that have enforced these kind of provisions. There's no risk. Third, we're not enforcing this provision as against creditors. Again, that goes to the insolvency risk. We're enforcing this as between the shareholders and the company. So, again, those policy concerns about dividends are just not being triggered. Lastly, if the contract itself is not allowed, then under the Huskinson case, or Huska and Brown case that we cited from the California Supreme Court, even when a contract itself is technically illegal, under California law, you can still have quantum merit, and that's what happened in that case. There was no appropriate client consent to a particular fee arrangement, but because the actual services and benefit was still conveyed, they still could get the quantum merit award. And here the award corresponds with the amount of taxes actually paid by Mr. Hubbard. So even if you couldn't have the contract, you certainly have the grounds where you've conveyed a benefit, you've paid for the corporation's taxes for three years, you've got the no benefit for paying for those taxes for three years, and now all you're doing is asking that you be reimbursed for those taxes because when you were bought out on your shares, it was a buyout effective as of back in 2009. I see I've got my red light. Any further questions? Thank you for your argument. Why don't you put five minutes on the clock? Thanks, Freddie. I'm going to address the shareholder agreement issue first. Good. Thank you. And I want to respond to your question about public policy because I think it's an important one, and the answer you got from counsel misconstrues the public policy at issue. He talks about the public policy about dividends being paid, and those are embodied in Sections 500 and 501 of the Corporation's Code, and certainly they are a public policy. But California law recognizes that every expression of the legislature is an expression of public policy. We're not looking at 500 sections of public policy. We're looking at Section 300 because it's a very simple matter of statutory construction. In Section 300A, the legislature sets out the general rule. The board of directors manages and controls, and there's no dispute that that includes the decision of when and how to pay dividends. Who are the board of directors? Pardon? Who are the board of directors here? The board of directors at what point in time? During the entire period before the dispute broke out, let's say. Before the dispute broke out, it was Mr. Hubbard, Mr. Pace, and Mr. Loya. So the directors essentially agreed to pay the dividend to cover their own tax liability as well as Mr. Hubbard's. And they acted, as I understand it, because they treated themselves as a subchapter S corporation, a closed corporation and a subchapter S corporation. The only difference here is what? I don't see that there's any great public policy that's being violated. Well, the public policy that's being violated is in the next section, 300B. 300A sets out the general rule. 300B sets out the exception. And it is a specific exception, and it makes it valid for a closed corporation to do that. But what, as a practical matter, was the difference between this company and a closed corporation? There were only three shareholders, and it didn't contain the words in the charter or wherever it's supposed to be that said we are a closed corporation. Is that it? Well, that's a very important distinction because the closed corporation Why would a California court think that that was so contrary to public policy that it wouldn't enforce an agreement among the directors to pay the shareholders, meaning themselves, an amount sufficient to cover their tax liability? I'll tell you why. Because it is a prospective mandate. The district court says this is not precatory language. It's a mandate. So you're making a mandate for future times that deprives the board, purports to deprive the board of discretion that it has when you're not a statutory closed corporation. You have to understand that in 1975, the California legislature made a paradigm shift in California corporation law by enacting the new general corporation law. It was so extensive that it delayed its effectivity for two years until 1977. It introduced a variety of unique concepts. So that when your clients got their 10% dividend, they were acting contrary to California law. What 10%? My clients never got a 10% dividend. They got whatever it is they got to pay their taxes. Or did nobody get it? Actually, the record doesn't show that they ever really complied with that agreement. And that was in the record. It was there in the shareholder agreement along with a lot of other things, but the record doesn't show that the parties ever actually complied with that. It's silent. We don't know one way or the other. I'm sorry? We don't know one way or the other. Well, I know, but it's not in the record. Right. That that happened. Why is it important, the profits issue that he discussed?  it is in the record that they were paying him this dividend essentially to cover the tax liability. They paid him from time to time. It was not in accordance with the formula of the shareholder's agreement. It just was never enforced. And let me tell you why. So they paid him, and we can't infer that they didn't pay themselves. Well, they were getting a significant salary that was covering it, so it was a needs situation. Let me tell you why it's important that you give full faith and credit to this public policy. It is a very crucial thing to usurp the prospective discretion of the board. Counsel suggests, well, this was only from profits. That is an illusory argument, and the reason it's illusory is profits is an accounting concept. It does not necessarily have any relationship to cash flow. Good example in the record. The record shows $750,000 was loaned by Mr. Pace and Mr. Loya to this corporation. That means that when that loan gets paid back, there is no deduction from profits for the principal repayment. So if it was paid back all at once, you would have an overstated profit of $750,000. That is one of the reasons why the board has to retain discretion. Another reason is you have to look at the totality of circumstances making a business judgment at that time. Is it better to pay a dividend or to put the money into rehabbing? Why did they stop paying him? They never paid any dividends under the agreement. They never paid any. It isn't that they stopped. They never did. Well, what about the equitable argument that you say? Well, he was paid out as of 2009, so why should he have to pay taxes post-2009 on a corporation from which he'd been cashed out? Well, that is an anomaly. That's why I end up with the quantum Merowit argument. I mean, what's wrong with that argument? I'd like to say everything. But the essence of what's wrong with it is that quantum Merowit is only for a service provider. Oh, sure. I understand the concept. But, I mean, the notion that he is cashed out of the company as of 2009 and pays taxes from 2009 on is somewhat anomalous. Well, that's because he overlooked the correct remedy. The correct remedy, if he's been mistreated, is to sue not the corporation but Pace and Loya for unjust enrichment because it was their shares that would have had an enhanced value based on undistributed cash if, in fact, cash was available for distribution. You don't enforce the— But that was a decision of the corporation. The shareholders couldn't enforce that. That was a decision of the corporation. Well— I mean, his argument basically is pretty simple. He says, look, I was cashed out of X state and I paid taxes on the corporate profits after X state so the corporation should reimburse me for that proportionate share of the taxes. He was cashed out because he made a litigation decision that gave a right that our clients— I understand. He didn't have to do that. He didn't have to— No, but he did. His problem is self-induced. But, I mean, everybody agreed you had to value the corporation as 2005. He is no longer—2009, thank you. And he is no longer considered a shareholder as of 2009, but he's paying shareholder taxes after that. No, no, that's wrong. He is a shareholder until the shares were bought out in 2012. He was a shareholder. As a shareholder. And his remedy, if he was either—would have been sued for unjust enrichment— But for all practical purposes, it's the same thing. You say his remedy was to sue the other two shareholders. In effect, that's what he's done here because they were—there's only this shield of the corporation, which is the technical distinction under the facts of this case. For all practical purposes, he was suing his two partners. Well, yeah, I find that argument frustrating because you're saying it's like you want to have it always. And then you're saying, well, he should have actually sued the other two partners instead of the corporation. And it kind of supports the theory that your clients have fought this every step of the way, tooth and nail. And then you're saying at the end, well, then he really should have sued him this way as opposed to suing him the other way. What I'm saying is you shouldn't enforce a contract that lacks a lawful objective. That's all I'm saying. And you shouldn't circumvent that public policy by creating a quantum Merowit argument that doesn't pass muster under California standards for when quantum Merowit is billed. It didn't provide any benefit to the corporation at all because it was not the corporation's tax obligation. The only benefit that you could argue was conferred was to the extent that dividends were not paid, cash was retained. It may have—and you don't know on this record—it may have enhanced the net worth of the corporation. But we don't know that on this record. So there's no reason to take that leap of faith either. Counselor, your time has expired. Yes, and I appreciate your indulgence. Yes, thank you very much. Thank you both for your arguments today. It's been helpful to the panel.
judges: Korman, Thomas, Callahan